James P. Keenley (State Bar No. 253106)
Brian H. Kim (State Bar No.  215492)
BOLT KEENLEY KIM LLP
1010 Grayson Street, Suite Three
Berkeley, California 94710
Phone: (510) 225-0696
Fax: (510) 225-1095

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO / OAKLAND DIVISION

| | |
|---|---|
| ELISE DRAGU | Case No.: 3:14-cv-04268 (RS) |
| Plaintiff, | **PLAINTIFF'S NOTICE OF MOTION, MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, JUDGMENT PURSUANT TO RULE 52; MEMORANDUM OF POINTS AND AUTHORITIES** |
| v. | |
| MOTION PICTURE INDUSTRY HEALTH PLAN FOR ACTIVE PARTICIPANTS | |
| Defendant. | Date: Nov. 5, 2015<br>Time: 1:30 PM<br>Courtroom: 3, 17th Floor<br>Judge: Hon. Richard Seeborg |

TO DEFENDANTS AND THEIR ATTORNEYS OF RECORD:  Please take notice that, on November 5, 2015, at 1:30 PM, or as soon thereafter as counsel may be heard, in Courtroom 3, 17th Floor, in the San Francisco Courthouse of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102, Plaintiff will and hereby does move this Court for summary judgment or, in the alternative, for judgment pursuant to Federal Rules of Civil Procedure 52 after entering findings of fact and conclusions of law.

In support of this Motion, Plaintiff relies on this Notice of Motion and Motion, the following Memorandum of Points and Authorities, the Declaration of James P. Keenley filed herewith, the

1   Declaration of Olga Gorbacheva filed herewith, the complete Court file in this action, and such other

2   matters as may be presented to the Court at the hearing.

3                                                          Respectfully submitted,

4   Dated:  October 1, 2015                          BOLT KEENLEY KIM LLP

5

6                                              By:   /s/ James P. Keenley

7

8                                          **Table of Contents**

9

I.     INTRODUCTION ............................................................................................................ 1

II.    STATEMENT OF FACTS ............................................................................................. 2

   A.    Ms. Dragu's Injuries And Treatment .............................................................. 2

   B.    Ms. Dragu's Claim for Benefits ...................................................................... 3

   C.    The Terms of the Plan ...................................................................................... 6

      1.    Terms Relating to Dental Implants............................................................. 7

      2.    Terms Relating to the SPDs' Effective Dates ............................................ 7

      3.    Terms Relating to Covered Services .......................................................... 7

      4.    Terms Relating to Prosthetic Devices and Reconstructive Surgery ........... 7

      5.    Terms Relating to Dental Coverage for Accidents..................................... 8

   D.    Allocation of Discretionary Authority to Interpret the Plan Terms ................ 8

   E.    The Benefits/Appeals Committee's Conflict of Interest .................................. 8

III.   LEGAL STANDARD.................................................................................................... 8

IV.    ARGUMENT ................................................................................................................ 9

   A.    Standard of Review .......................................................................................... 9

   B.    The 2007 SPD Governs Ms. Dragu's Claim ................................................... 10

1.  The SPDs Are Ambiguous ........................................................ 10

2.  The Ambiguity Should Be Resolved in Favor of Applying the 2007 SPD ............... 11

C.  The 2007 SPD Covers Installation of Ms. Dragu's Prosthetic Teeth ........................... 12

D.  The 2013 SPD Also Covers Installation of Ms. Dragu's Prosthetic Teeth ................... 12

E.  The Appeals Committee Abused Its Discretion ............................................. 15

1.  The Committee Has a Conflict of Interest ................................................ 15

2.  The Plan Administrator Did Not Comply With ERISA Section 503 ........................ 16

3.  The Medical Director Did Not Utilize a Reasonable Review Process ....................... 17

4.  The Plan's Initial Denial Blatantly Misrepresents the Plan Terms ........................... 19

5.  The SPD Language Changed Midway Through Ms. Dragu's Treatment ................. 19

V.  CONCLUSION ........................................................................... 20

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Table of Authorities

**Cases**

*Abatie v. Alta Health & Life Ins. Co.*, 458 F. 3d 955 (9th Cir. 2006)......................................... 9, 17

*Armistead v. Vernitron Corp.*, 944 F.2d 1287 (6th Cir. 1991) ....................................... 11

*Booton v. Lockheed Medical Benefit* Plan, 110 F.3d 1461 (9th Cir. 1997) ............................. 1, 19

*Evans v. Safeco Life Ins. Co.*, 916 F.2d 1437 (9th Cir. 1990) ........................................ 11

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989) ......................................... 9

*Gritzer v. CBS, Inc.*, 275 F.3d 291 (3d Cir. 2002)............................................... 9

*Jebian v. Hewlett-Packard Co. Employee Benefits Org. Income Protection Plan*, 349 F.3d 1098

   (9th Cir. 2003).................................................................................... 9, 10

*Kearney v. Standard Ins. Co.*, 175 F.3d 1084 (9th Cir. 1999) ....................................... 9

*McGee v. Equicor-Equitable HCA Corp.*, 953 F.2d 1192 (10th Cir. 1992) ................................ 15

*Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008) ............................................ 15

*Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623 (9th Cir. 2009)................................... 15

*Richardson v. Pension Plan of Bethlehem Steel Corp.*, 112 F.3d 982 (9th Cir. 1997).......... 10, 11

*Rossetto v. Pabst Brewing Co., Inc.*, 217 F.3d 539 (7th Cir. 2000)............................................ 10

*Smathers v. Multi-Tool, Inc.*, 298 F.3d 191 (3d Cir. 2002) ........................................ 15

**Statutes**

ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) ................................................ 9

ERISA § 503, 29 U.S.C.  § 1133 ................................................................ 16

**Regulations**

29 C.F.R. § 2560.503-1(f)................................................................ 3, 4, 16

29 C.F.R. § 2560.503-1(f)(2)(iii)(A) ...................................................... 3, 16

29 C.F.R. § 2560.503-1(f)(2)(iii)(B) ......................................................... 4

29 C.F.R. § 2560.503-1(g)................................................................ 17

**Rules**

Federal Rule of Civil Procedure 52(a) ..................................................... 9

Federal Rule of Civil Procedure 56 ....................................................... 8

I.      **INTRODUCTION**

In *Booton v. Lockheed Medical Benefit Plan*, one of the more colorful opinions in the ERISA jurisprudential canon, Judge Kozinski aptly summarized the grim fate sometimes met by those who find themselves in need of comprehensive medical treatment for injuries to their mouth: "Majorie Booton's first misfortune was being kicked in the teeth by a horse. Her second was being rebuffed by a medical insurer that seemed to not understand-or want to understand-the nature of her first misfortune." 110 F.3d 1461, 1462 (9th Cir. 1997).

Elise Dragu can no doubt relate to Ms. Booton.  She was grievously injured in a serious fall; her injuries required significant reconstructive surgery, including the installation of prosthetic teeth. Her medical benefit plan – the Motion Picture Industry Plan for Active Participants (the "Plan") – covers prosthetic devices, it covers reconstructive surgery, and it specifically covers a service labeled "dental implants." But when she sought coverage for these costly, multi-stage surgical procedures from her medical benefit plan, the administrator repeatedly delayed resolution and misled her as to the terms of her medical coverage.

To be clear, there is no dispute here that the prosthetic teeth Ms. Dragu received were medically necessary and clinically appropriate. The Defendant's claim denial is instead based entirely on the assertion that the services Ms. Dragu needed were specifically excluded from the Plan's benefits. First, this came in the form of a false claim that the Plan provided no "dental" benefits at all, and when Ms. Dragu pointed out the Plan language contradicting that statement, the Plan's personnel then parsed the meaning of "dental implants" so fine as to exclude the most important (and expensive) part of the procedure: the actual teeth.

The administrator's decision should not be allowed to stand.  It is contrary to the plain language of the Plan and it is not the product of a principled and deliberative claims review process. Ms. Dragu is entitled to coverage of all reasonably necessary medical services necessary to install her prosthetic teeth.

## II.    STATEMENT OF FACTS

### A.  Ms. Dragu's Injuries And Treatment

On August 20, 2012, Ms. Dragu was out hiking in the scenic forests of the north coast of California when she took a serious fall down a steep river embankment, causing severe traumatic injuries. Exh. 1 at 832.[1] In addition to fracturing her wrist and sustaining numerous lacerations all over her body, Ms. Dragu severely injured her face and mouth:  several of her teeth were fractured, torn from their roots, pushed well out of position, and were so loose that she feared accidentally swallowing or inhaling one; her jawbone was fractured and had to be surgically repaired with plates and screws, her gums, mouth, and chin were severely lacerated. Exh. 2 at 835, 837. These injuries required extensive care with multiple surgical procedures, first to repair the broken bones, then to remove the broken teeth, and then to replace those teeth with prosthetics. *Id.* at 836. Months of healing time were required between each of these procedures before Ms. Dragu could proceed to the next phase of treatment. *Id.* at 836-37.

The treatment that forms the subject of this lawsuit is that which was necessary for Ms. Dragu to obtain prosthetic teeth to replace the teeth that were destroyed by her traumatic injury on August 20, 2012.  Ms. Dragu first consulted with her oral surgeon, Robert A. Shuken, D.D.S., about a week after her fall, and his conclusion at that time was that likely six or seven of her teeth would need to be removed and replaced with prosthetic teeth, but she was still not sufficiently healed from her jawbone fractures to begin performing these procedures.  *Id.* at 836.  On November 5, 2012, Ms. Dragu had a follow-up consultation with Dr. Shuken which showed some modest improvement: as her jaw healed it appeared that some of the teeth could be saved, only five or six seemed headed for certain removal. *Id.* at 464. On December 10, 2012, Ms. Dragu was again evaluated and Dr. Shuken made a final determination that the teeth needed to be removed from six sites. *Id.* at 707.

On February 1, 2013, Dr. Shuken surgically removed six of Ms. Dragu's teeth and placed bone grafts as needed. *Id.* at 465. Dr. Shuken concluded at the time of the operation that with five to six

---

[1] All exhibits referenced herein are filed as attachments to the Declaration of James P. Keenley in Support of Plaintiff's Motion for Summary Judgment.  Except where otherwise indicated, all page references are to pagination provided by Defendant when it produced the collection of documents it deems to be the "administrative record."  The leading digits "D0…" have been omitted for brevity.

months of healing time there would be sufficient bone available to begin placing implants at four of the missing teeth sites. *Id.* at 466. On September 12, 2013, Dr. Shuken installed "fixtures" into Ms. Dragu's jawbone at three of the four sites and covered those fixtures with temporary sutures, unfortunately there was not sufficient bone growth at the fourth site to place a fixture.  *Id.* at 467.

After the fixtures had sufficiently healed the case would be handed over to Shahriar Parvispour, D.D.S., who specialized in the installation of two other component parts of Ms. Dragu's prosthetic teeth – the abutments and the crowns – atop the fully healed fixtures, which would bring the treatment to a conclusion. *Id.* at 468.  This final stage of the process was itself a multi-procedure affair conducted in March, April and June, 2014.  Declaration of Elise Dragu, Exh. 1.[2]

**B.  Ms. Dragu's Claim for Benefits**

Ms. Dragu's claim for benefits played out over the course of more than a year. For the first surgery Dr. Shuken submitted, on Ms. Dragu's behalf, a preapproval request to the Plan on January 7, 2013. Exh. 4 at 931. The preapproval request sought explicit approval of the surgery necessary to remove Ms. Dragu's unsalvageable teeth. *Id.* Dr. Shuken's request included a detailed description of the full treatment plan, including the anticipated installation of prosthetic teeth some months in the future. *Id.* at 934-937.

The Secretary of Labor has promulgated regulations applicable to "pre-service" claims under ERISA-governed health plans that require plan administrators to respond to such claims within 15 days or, where special circumstances require and upon written notice of those circumstances to the claimant, 30 days of the request. 29 C.F.R. § 2560.503-1(f)(2)(iii)(A). The Plan did not comply or attempt to comply with this deadline in response to Dr. Shuken's request. The first action the Plan took, referral of the matter to an outside consultant, was on February 4, 2014, 27 days after the initial request. *Id.* at 941. The consultant responded favorably that same day, but the Plan did not notify Dr. Shuken about the preapproval until February 20, 2014 – 41 days after the request. *Id.* at 939. The Plan

---

[2] Ms. Dragu's ability to obtain this procedure was delayed far beyond the required healing time because the Defendant's failure to pre-approve the procedure left her in the position of having to pay out of her own pocket for these services, which cost $24,000.  Documentation of the dates on which Ms. Dragu underwent these procedures is not included in Defendant's document production.  In order for the Court to conduct a complete review, a copy of Dr. Parvisopour's ledger, which shows the dates and amounts charged and paid for this work, is attached to the Declaration of Elise Dragu as Exhibit 1.

made no effort to explain why it could not comply with the deadlines and did not provide the notice required by law.

On August 29, 2013, Dr. Shuken submitted a pre-authorization request for placement of "endosteal surgical implants" at three sites in Ms. Dragu's mouth. Dragu Dec., Exh. 2.[3] On September 12, 2013, having not heard anything from the Plan, Dr. Shuken performed the procedure and installed three "fixtures" – the posts that anchor the crowns to her jaw – into Ms. Dragu's jawbone. Exh. 2 at 467-68. On September 16, 2013, he submitted a claim to the Plan for payment for these services on Ms. Dragu's  behalf. *Id.* at 994. Under the regulations, when faced with a post-service claim, a plan must respond within thirty days or, upon written notice to the participant, forty five days of the claim. 29 C.F.R. § 2560.503-1(f)(2)(iii)(B).

The Plan, again, did not comply with the regulations. The next correspondence directed to Dr. Shuken was a letter from the medical director, C.H. Armstrong, III, M.D., dated November 12, 2013 which purported to deny Dr. Shuken's "preauthorization request" for "placement of implants" on the sole alleged basis that "Dental services are not covered under the Plan." Exh. 4 at 532. This response came seventy five days after the original request, which is forty five days beyond them maximum allowable timeframe.

On October 31, 2013, Dr. Shahariar Parvizpour, a specialist in prosthetic dental appliances, sought pre-authorizatoin for the placement of abutments and crowns atop the fixtures that had been installed by Dr. Shuken. Exh. 5 at 527-531. He proposed to conduct this procedure in November 2013, but the Plan never responded to his request. *Id.* Eventually, after needlessly going months without functional teeth, Ms. Dragu paid for the services and materials out of her own pocket. Dragu Dec., Exh. 1.

The November 12, 2013 adverse benefit determination as to Dr. Shuken's pre-authorization request did not include several notices that are required by law as to Ms. Dragu's appeal rights, but it did lead Ms. Dragu to submit a comprehensive appeal on January 17, 2014, explaining the details of

---

[3] Although the Plan must have received this request because the medical director purported to deny it on November 12, 2013 (Exh. 4 at 532), Plaintiff was unable to locate this document within the files produced by Defendant as the "administrative record" in this case. Clearly, it should be a part of the record.

her treatment plan, citing the SPD language on which her claims were grounded, and setting forth her frustrations with the Plan administrator's handling of her claims. Exh. 6 472-474.[4]

By letter dated March 25, 2014, the Plan denied Ms. Dragu's appeal. Exh. 7 at 460.  The totality of the explanation offered for the appeal denial is as follows:

> On March 25, 2014, the Benefits/Appeals Committee reviewed your request for review listed above.  Your appeal was denied.  The determination of the Committee was that per the Active MPI Health Plan Summary Plan Description, October 2013 – page 57, "Prosthetic rehabilitation of dental implants including abutments and crowns are not covered under the medical benefit."

*Id.*  No further explanation for the denial was offered, for example, why the Plan was applying an SPD effective October 2013 to a claim that arose from an injury in August 2012, or why the services Ms. Dragu received constituted "prosthetic rehabilitation of dental implants including abutments and crowns." In fact, the March 25, 2014 appeal denial was the first time the Plan ever relied on this SPD or this Plan language to deny Ms. Dragu's claim.

The March 25, 2014 letter does not, however, fully describe what the Plan had done in response to the appeal.  Notwithstanding his prior representation that "Dental services are not covered under the Plan," on January 27, 2014, Dr. Armstrong partially granted the appeal, concluding in a handwritten note that the "dental implants service" should have been allowed because the service was "secondary to trauma" but that "medical does not cover the abutments and crowns." Exh. 8 at 478.

After apparently reversing his previous position on Ms. Dragu's claim of his own authority, Dr. Armstrong then wrote a memorandum to the Plan's appeals committee, dated March 5, 2014, which characterized the issue on appeal as "The Appellant is requesting the Medical Plan cover the abutments and crowns for the implants." Exh. 8 at 461. This is an oversimplification of Ms. Dragu's actual appeal, which sought coverage for all of the procedures necessary for her to obtain

---

[4] For example, Ms. Dragu noted that upon Dr. Shuken's submission of the September 16, 2013 claim (Exh. 3 at 994), she was contacted by the medical director, C.H. Armstrong, III, and asked, for the first time in the year since she was injured, to fill out a "third party liability questionnaire" even though it was abundantly clear from the records already submitted that no third party was involved. Exh. 6 at 473.  Curiously, this form did not show up in the documents Defendant produced to Plaintiff as the "administrative record."

reconstructive surgery and prosthetic teeth. But Dr. Armstrong's characterization of the issue in Ms. Dragu's appeal did have the effect of tailoring the issue under review to mirror language that had been inserted into a brand new SPD; the new language stated "Prosthetic rehabilitation of dental implants including abutments and crowns are not covered under the medical benefit." Exh. 7 at 460.

There is essentially no evidence in the record of what exactly the Plan's Appeals Committee did in response to Ms. Dragu's appeal and Dr. Armstrong's misleading memorandum – the only apparent record of the Committee's actions is at D00459 consists of a two-sentence note describing the Committee's ultimate conclusion; a conclusion that simply regurgitated the plan language quoted by Dr. Armstrong without any analysis. Exh. 9 at 459.

### C. The Terms of the Plan

The governing terms of the Plan are set forth in numerous different documents – including, but not limited to, the Plan's summary descriptions ("SPDs") and the Declaration and Agreement of Trust (the "Trust Agreement").[5]  The only plan document that was cited in either the initial claim denial or appeal denial came in the final denial of Ms. Dragu's appeal, and it was the SPD with an effective date of October 1, 2013 (the "2013 SPD").  Exh. 7 at 460.

But Plaintiff's injury was sustained over a year before the 2013 SPD went into effect, and the treatment plan that culminated in the installation of her prosthetic teeth was put into irreversible motion at least six months before this SPD went into effect, when she had the first surgical procedure necessary for the treatment. Exh. 1 at 832, Exh. 2 at 835, 465-66. Preapproval for the first stages of that treatment, which included a detailed description of the full treatment plan, was sought in January 2013, and granted in February 2013. Exh. 3 at 931, 939. The fixtures of her prosthetic teeth were implanted into her jawbone on September 12, 2013. Exh. 2 at 467-68. The only service that was performed after October 1, 2013 was the installation of abutments and crowns on top of the fixtures, which took place in March, April, and June 2014. Dragu Dec., Exh. 1. At no time during the claim and appeals process did the plan administrator explain why it was using the October 1, 2013 SPD instead of the prior SPD (which has an effective date of July 1, 2007).

---

[5] The October 1, 2013 SPD is referred to herein as the "2013 SPD" and is attached as Exhibit 10 to the Keenley Declaration, the prior SPD, with an effective date of July 1, 2007, is referred to herein as the "2007 SPD" and is attached as Exhibit 11. The Trust Agreement is attached as Exhibit 12.

### 1. Terms Relating to Dental Implants

The SPDs contain different language regarding coverage of "dental implants" and thus the plan administrator's decision to use the October 1, 2013 SPD was significant.  The denial of Ms. Dragu's claim is based entirely on a specific treatment exclusion – for "prosthetic rehabilitation of dental implants" – that only appears in the 2013 SPD. Exh. 7 at 460. This language does not appear in the 2007 SPD. *Compare* Exh. 10 (2013 SPD) at 217 with Exh. 11 (2007 SPD) at 380. The 2007 SPD states that "dental implants" are not covered "except where there is no other dental alternative," and it states that participants are "strongly advised" to obtain preauthorization for the installation of dental implants. Exh. 11 at 380, 382.

### 2. Terms Relating to the SPDs' Effective Dates

The SPDs contain nearly identical language regarding their effective dates. The 2007 SPD states that it is "effective for all expenses incurred on or after July 1, 2007, and supersedes and replaces all similar information previously issued."  Exh. 11 at 317. The 2013 SPD states that it is "effective for expenses incurred on or after October 1, 2013, and supersedes and replaces all similar information previously issued." Exh. 11 at 157. Neither SPD defines what it means for an expense to be "incurred" and this question was not considered by the plan administrator during the claim and appeal process.

### 3. Terms Relating to Covered Services

The SPDs contain identical language stating that the plan is a "comprehensive" medical benefit plan that covers "reasonable and necessary medical services in connection with the diagnosis and treatment of any non-industrial illness or injury." Exh. 10 at 202, Exh. 11 at 358.  The external consultant hired by the plan administrator to review Ms. Dragu's claim does not dispute that the prosthetic teeth were reasonable and necessary services for Ms. Dragu's injuries.  Exh. 12 at 471.

### 4. Terms Relating to Prosthetic Devices and Reconstructive Surgery

Both SPDs explicitly provide for coverage of "prostheses."  Exh. 10 at 221, Exh. 11 at 388. Both SPDs also explicitly provide coverage for "reconstructive surgery when medically indicated" and "reconstruction due to accidental injury." Exh. 10 at 221, Exh. 11 at 388.

### 5.  Terms Relating to Dental Coverage for Accidents

The Plan is a multi-benefit welfare plan that also provides dental benefits through a separate group insurance policy.  The SPDs state that the dental benefit covers "prosthodontic appliances" for installation with "dental implants."  Exh. 10 at 264; Exh. 11 at 422.  Coverage for replacement appliances is provided once every five years unless certain special circumstances are satisfied, in which case it may be more frequent.  *Id.*  But, in the case of "accidents" coverage under the dental plan is limited to a $2,000 annual maximum and the services must be provided "within 180 days following the date of accident." *Id*. The plan administrator did not suggest at any point during the claim or appeal process that Ms. Dragu's claim should be covered under the dental benefit portion of the Plan.

### D.  Allocation of Discretionary Authority to Interpret the Plan Terms

The SPDs state that discretion to interpret the "Plan of Benefits" and the "Trust Agreement" is installed in the "Benefits/Appeals Committee." Exh. 10 at 226; Exh. 11 at 383. There is no evidence of what actions or deliberations, if any, the "Benefits/Appeals Committee" took to interpret the "Plan of Benefits" in this case.

### E.  The Benefits/Appeals Committee's Conflict of Interest

Ms. Dragu's medical benefits are paid from a trust funded by contributions from  the "sponsors" of the Plan, which are the numerous motion picture industry employers and unions who entered into collective bargaining agreements to establish the fund. Exh. 11 at 444-45; Exh. 13 at 13.

The Benefits/Appeals Committee consists of "Directors" who are appointed to serve by the plan sponsors – some are appointed by the employers, some by the unions. Exh. 13 at 26, 61.  Thus, when the Benefits/Appeals Committee exercises discretionary authority to interpret the Plan terms, it is exercising that authority under a structural conflict of interest: any decision favorable to a claimant will require the trust to make payments, which in turn must be funded by contributions from the plan sponsors who appoint the directors.

### III.   LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) authorizes a party claiming relief to move for summary judgment "on all or part of the claim."  Summary judgment is proper where "there is no genuine issue as to any material fact . . . and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

1    56(c). Plaintiff's motion is brought in the alternative pursuant to Rule 52(a), which, in the event that

2    there are disputed issues of material fact, permits the court to make findings of fact and conclusions of

3    law. *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999).

## IV. ARGUMENT

5       Complete installation of prosthetic teeth, including the fixtures, abutments, and crowns, was a

6    medically necessary treatment occasioned by Ms. Dragu's severe facial injuries. The services

7    necessary to accomplish this treatment were covered under the plain language of the governing Plan

8    document, which expressly allows for prosthetics and reconstructive surgery. Defendant's denial of

9    Ms. Dragu's claim is based entirely on a purported plan exclusion that (a) is not included in the SPD

10    that governs Ms. Dragu's claim and, (b) would not operate to exclude Ms. Dragu's treatment even if it

11    did apply.

### A. Standard of Review

13       The default standard of review of a claim for benefits under 29 U.S.C. § 1132(a)(1)(B) is *de*

14    *novo*. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 112-15 (1989). The only instance in

15    which abuse of discretion review applies is where the written terms of the plan grant discretionary

16    authority to interpret the terms of the plan, and where that authority is actually exercised as granted.

17    *Id.* at 112-113; *see also Gritzer v. CBS, Inc.*, 275 F.3d 291, 295 (3d Cir. 2002) (failure to exercise

18    discretionary authority during claim process results in de novo review).

19       If the terms of the plan do grant discretion, courts still "review de novo a claim for benefits

20    when an administrator fails to exercise discretion." *Abatie v. Alta Health & Life Ins. Co.*, 458 F. 3d

21    955, 972 (9th Cir. 2006). This is because "[d]eference to an exercise of discretion requires discretion

22    to actually have been exercised." *Jebian v. Hewlett-Packard Co. Employee Benefits Org. Income*

23    *Protection Plan*, 349 F.3d 1098, 1106 (9th Cir. 2003). Thus, when "a trustee fails to act or to exercise

24    his or her discretion, *de novo* review is appropriate because the trustee has forfeited the privilege to

25    apply his or her discretion; it is the trustee's analysis, not his or her right to use discretion or a mere

26    arbitrary denial, to which a court should defer." *Id. quoting Gritzer*, 275 F.3d at 296.

27       Here, there is no evidence whatsoever that the entity vested with discretionary authority – the

28    "Benefits/Appeals Committee" – actually exercised that discretion. The only document in the record

that seems to constitute documentation of the Committee's actions is a two-sentence notation of the Committee's final decision. Exh. 9 at 459.  The one-paragraph denial letter sent explaining the determination on appeal similarly contains no analysis of any kind, it just quotes a sentence from the SPD without providing any context or explanation of why it applies. Exh. 7 at 460. Deference is owed to the Committee's "analysis" not its "right to use discretion or a mere arbitrary denial" and the Committee's failure to accompany its decision with any analysis at all forfeited its privilege to apply its discretionary powers to this claim. *Jebian*, 349 F.3d at 1106. Accordingly, the Court should review this matter *de novo*.

### B. The 2007 SPD Governs Ms. Dragu's Claim

By their own terms, the SPDs only apply to "expenses incurred" after specified dates, July 1, 2007 for the 2007 SPD, and October 1, 2013 for the 2013 SPD. The question, then, is what does it mean for a medical expense to be incurred? How do we know when this has happened? The SPDs themselves do not further define the term "incurred" and the Committee did not consider this issue, it simply reflexively applied the 2013 SPD without analysis.

### 1.        The SPDs Are Ambiguous

When an ERISA plan (or any contract or trust agreement) contains language that is susceptible to multiple meanings it is said to have a "patent ambiguity," and when the language becomes ambiguous by application to external context, it is said to have a latent ambiguity. *Rossetto v. Pabst Brewing Co., Inc.*, 217 F.3d 539, 543 (7th Cir. 2000).  When the terms of an ERISA plan are ambiguous, the Court must resolve the ambiguity by resort to ordinary principles of contract interpretation. *Richardson v. Pension Plan of Bethlehem Steel Corp.*, 112 F.3d 982, 985 (9th Cir. 1997).

One reasonable interpretation of the word "incur" when used in the context of an "expense" is that an expense is incurred when one takes actions that make the expense necessary. Here, at the very latest, Ms. Dragu incurred the expenses of having abutments and crowns installed when she had the fixtures implanted into her jawbone on September 12, 2013. The fixtures are merely the posts that anchor the visible portion of a prosthetic tooth (the crown) to the jawbone. There is no medical

purpose in installing such fixtures without installing the component parts that go on top of them – such an action would leave the patient worse off than if she had no teeth at all.

Prior to installing the fixtures, Ms. Dragu had options. Undesirable ones to be sure, such as simply getting by without the missing teeth, but options all the same. But once the fixture installation procedure was performed, Ms. Dragu had no choice but to go forward with installation of abutments and crowns, and thus she effectively incurred the expenses of the crowns and abutments once the fixtures were installed. At that time, the 2007 SPD was the governing Plan document.

Another plausible meaning of the word "incur" when used in the context of an "expense" is that an expense is incurred when it is billed. Or an expense could be incurred when money actually changes hands. Another is that an expense is incurred when a person acquires a legal obligation to pay. In the context of an expense for a necessary medical treatment, another reasonable reading would be that the expense is incurred when the underlying condition or injury arises. All of these interpretations yield different results for which SPD applies to Ms. Dragu's claim. The SPDs are thus patently ambiguous as applied to Ms. Dragu's claim.

### 2.  The Ambiguity Should Be Resolved in Favor of Applying the 2007 SPD

When courts resolve ambiguities in ERISA plans, they interpret the language "in an ordinary and popular sense" and "in the light of the context that gave rise to its inclusion." *Richardson*, 112 F.3d at 985 (*quoting Evans v. Safeco Life Ins. Co.*, 916 F.2d 1437, 1441 (9th Cir. 1990), *Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1293 (6th Cir. 1991)).

In the present context – in which the Plan is obligated to pay for reasonable and necessary medical care – it makes the most sense to interpret the term "expenses incurred" to refer to when the medical care became necessary.  The abutments and crowns that are the subject of this lawsuit arguably became necessary once Ms. Dragu suffered her injuries on August 20, 2012; they absolutely became necessary once she had the fixture portions of the prostheses installed on September 12, 2013. In either case, the 2007 SPD applies. The only reason the abutments and crowns were not installed before October 1, 2013 is because of the extensive healing time required between each stage of the prosthetic tooth installation.

Where there is an ambiguity as to whether an amended ERISA plan document applies to a multi-step comprehensive treatment plan like Ms. Dragu's, the best resolution to the ambiguity is to apply the terms in effect when the patient committed to the treatment plan. This makes it possible for patients to make reasonable and informed decisions about complicated medical treatment with some degree of certainty that the terms of their benefit plan will not change midway through the treatment process, thereby upholding the reasonable expectations of the plan participant.

The ambiguity should also be resolved in favor of the 2007 SPD because the trustees of the Plan easily could have drafted clearer language if their intent was to make sure that the 2013 SPD applied to any service rendered after October 1, 2013. For example, the 2013 SPD could have said "this SPD applies to any service performed after October 1, 2013." Instead, they used more ambiguous phrasing that, especially when considered in the context of Ms. Dragu's mult-stage treatment plan, renders the 2013 SPD inapplicable.

### C.   The 2007 SPD Covers Installation of Ms. Dragu's Prosthetic Teeth

The 2007 SPD (like the 2013 SPD) covers all reasonable and necessary medical services for which the Plan has established a benefit, and the Plan has established benefits for prosthetic devices and reconstructive surgery following an accidental injury. Exh. 11 at 358, 388.

Here, both Ms. Dragu's oral surgeon and an outside consultant hired by the Plan determined that surgical installation of prosthetic teeth was medically necessary reconstruct Ms. Dragu's mouth and replace her unsalvageable natural teeth–the necessity and reasonableness of the treatment is not in dispute. Exh. 2 at 835-37, Exh. 12 at 471. Since the teeth are necessary, they should be covered like any other prosthesis. There are no terms in the 2007 SPD that can be plausibly read to exclude prosthetic teeth from coverage where those prostheses are medically necessary.

### D.   The 2013 SPD Also Covers Installation of Ms. Dragu's Prosthetic Teeth

The Plan actually did cover a significant portion of Ms. Dragu's prosthetic teeth and reconstructive surgery as a medical benefit: it covered the surgeries necessary to repair her fractured jaw, the surgeries necessary to remove her ruptured teeth, and the surgeries to install the fixtures that anchor her new teeth to her jawbone.

The treatment the Plan did not cover as a medical benefit was the installation of abutments and crowns on top of the fixtures – the visible "tooth" part of the prosthesis –  which is an expensive procedure that Ms. Dragu ended up paying for out of her own pocket. The medical director and Appeal Committee's sole justification for doing this is a term in the 2013 SPD, contained under a subheading reading "Medical Services Provided by Dentists" that reads as follows:

> Oral appliances are not covered for the treatment of malocclusion or bruxism. Dental implants may be covered in cases of trauma, ablative surgery or congenital anomalies. Prosthetic rehabilitation of dental implants including abutments and crowns are not covered under the medical benefit.

Exh. 10 at 217.

Neither the Appeals Committee nor the Plan's medical director has ever explained why this language covers installation of the fixtures, but not the first set of abutments and crowns necessary to complete the installation of Ms. Dragu's prosthetic teeth. Initially, the administrator refused to cover both services on the grounds that "Dental services are not covered under the Plan." Exh. 4 at 532. No Plan language was cited in support of that rationale and indeed it is transparently contradicted by the actual SPD terms, which expressly provide for coverage of specified medical services provided by dentists and in no way limit coverage for "medically necessary" services to only certain types of doctors or areas of the body.

On appeal, the medical director changed his mind and concluded that the "implants" were covered by the Plan, but that the abutments and crowns were not. Exh. 8 at 478. No written explanation of that conclusion, or of what exactly is and is not considered a "dental implant," was ever provided to Ms. Dragu or her doctors. The surgical report accompanying the installation of Ms. Dragu's fixtures, a surgery the Plan did cover, did not describe the products as "dental implants;" the doctor reported installing a "Nobel Active fixture" and an "External HEX fixture." Exh. 2 at 467.

No doubt the fixtures are included within the term "implants" – their function is to be implanted into the jaw bones – but it appears from context that the medical director believed that the fixtures are the only piece of equipment falling under the term "dental implants." And, in turn, it appears that the medical director reads the sentence "Prosthetic rehabilitation of dental implants including abutments and crowns are not covered under the medical benefit" as meaning that the initial

installation of crowns and abutments atop an implanted fixture is a type of "prosthetic rehabilitation" that is excluded by the Plan. This interpretation of the Plan has been adopted wholesale, and without analysis, by the Appeals Committee.

But this interpretation makes no sense. First, it conflicts with the plain language of the sentence in question – the term "rehabilitation" necessarily implies the presence of an existing damaged prosthesis that can be rehabilitated. We do not speak of rehabilitating healthy body parts, we rehabilitate injured body parts. Likewise for a prosthetic body part—we do not rehabilitate a brand new prosthesis, we rehabilitate a broken one.

Further, the structure of the sentence suggests that the term "dental implants" is inclusive of the fixtures, crowns, and abutments that form a complete implant. It says that rehabilitation of the implants, including rehabilitation of the abutments and crowns, is not covered. Installation is covered, repairs are not. That is a sensible reading of the term that makes the exclusion consistent with the Plan's provision of coverage for medically necessary prosthetic devices, which are plainly included as medical benefits, and with the prosthodontic maintenance benefits provided under the dental portion of the plan, which allows for crowns to be replaced every five years but excludes the initial installation of implants. Exh. 10 at 221, 264.

The medical director's interpretation of the 2013 SPD also leaves a bizarre and irrational gap in coverage. Under his interpretation a participant who meets with the misfortune of having her teeth destroyed in a traumatic accident can get coverage for a surgical procedure to place artificial devices into her jawbone for the express and sole purpose of mounting teeth on top of those devices, but no coverage for the teeth themselves, which would not covered as either a medical or a dental benefit. That is a strangely incomplete benefit; it's like covering the installation of a prosthetic arm that does not have a hand attached. Indeed, it is hard to see how installation of a dental implant could ever be a "medically necessary" service if the service did not include installation of a crown as this would not provide any medical benefit. It would instead leave the patient with an incomplete prosthetic device: a useless post embedded in her jaw. If Ms. Dragu had not had the assets (which were borrowed) to pay for abutments and crowns out of her own pocket, this is exactly where she would have found herself.

There is no evidence of any kind in the administrative record justifying the medical director's conclusion that the term "dental implants" does not include the abutment and crown portions of the implant. There is also no evidence in the administrative record justifying the medical director's conclusion that initial installation of crowns and abutments is an excluded "prosthetic rehabilitation" of a dental implant. It is well settled that when ERISA governed health benefits are denied on the basis of an exclusion from coverage, the plan bears the burden to show that the exclusion applies. *Smathers v. Multi-Tool, Inc.*, 298 F.3d 191, 200 (3d Cir. 2002); *McGee v. Equicor-Equitable HCA Corp.*, 953 F.2d 1192, 1205 (10th Cir. 1992). The Plan has done nothing to meet that burden here.

Accordingly, no matter which version of the SPD is applied, the plain language of these documents requires the Plan to cover the full set of procedures necessary to install Ms. Dragu's prosthetic teeth, including the abutments and crowns.

### E.  The Appeals Committee Abused Its Discretion

The Court should not defer to the Appeals Committee's application of the 2013 SPD because, as explained above, there is nothing of substance to which the Court could defer. Nonetheless, to the extent the Court does review the matter for an "abuse of discretion" it is clear that the Appeals Committee's and the medical director's actions constituted abuses of discretion. Moreover, the claim denial is, as explained above, in conflict with the plain language of the Plan that provides coverage for prosthetic devices. Since it is always an abuse of discretion to fail to apply the plain language of a plan, the claim denial should be overturned under any standard of review.

### 1.  The Committee Has a Conflict of Interest

If the Court decides to apply abuse of discretion review, it must factor in the Appeals Committee's conflict of interest when considering whether that discretion was abused. *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008). Here, there is a structural conflict of interest because the Appeals Committee consists of persons appointed by the plan sponsors who are ultimately responsible funding for the Plan benefits. Much like the case of an insurance company, this puts the trustees in the position of making decisions about their own liability for benefits. Application of the abuse of discretion standard "requires a more complex analysis" when such a structural conflict exists. *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 630 (9th Cir. 2009).

Here, there is substantial evidence that the conflict of interest significantly affected the claim decision: the administrator repeatedly failed to comply with legal deadlines to respond to Ms. Dragu's physicians' requests for pre-service authorization and post-service payment, there is no evidence that the Appeals Committee undertook any substantive analysis of Ms. Dragu's claim, the SPD terms changed, in a manner directly relevant to Ms. Dragu's claim, in the middle of her treatment plan. Thus, the conflict of interest should be considered a significant factor when weighing whether the Appeals Committee abused its discretion.

### 2.   The Plan Administrator Did Not Comply With ERISA Section 503

Section 503 of ERISA requires benefit plans to provide adequate notice of benefit claim denials and a reasonable opportunity to obtain a full and fair review of those denials. 29 U.S.C. § 1133.  The Secretary of Labor is empowered to enact regulations to enforce this requirement, and she has done so: group health plans are required to comply with strict deadlines when responding to claims for pre-service authorization and post-service payment.  *See* 29 C.F.R. § 2560.503-1(f).  The Plan did not comply with these deadlines when handling Ms. Dragu's claims related to her fractured teeth.

First, the Plan repeatedly failed to provide timely responses to Ms. Dragu's requests for preauthorization of the various procedures included in her treatment plan recommended by her doctors. The delays were substantial and completely unjustified; for example, even though the regulations require plans to respond to pre-service requests for authorization within fifteen days (29 C.F.R. § 2560.503-1(f)(2)(iii)(A)), the Plan did not take any action at all on Ms. Dragu's first request for such authorization for twenty seven days (Exh. 3 at 941). And even though the Plan had *immediately* received a response from its consultant stating that the service should be authorized, it inexplicably waited another sixteen days before providing that favorable response to Ms. Dragu's doctor (Exh. 3 at 939). In the meantime, since her teeth were literally broken, displaced, and loose, Ms. Dragu had to undergo that surgical procedure without waiting for the Plan's preapproval.

The same thing happened, only with even greater delay, when Ms. Dragu sought preauthorization for the installation of fixtures, had the surgery, submitted a claim for payment for the surgery and then, *seventy-five days* after the request for *preauthorization*, and two months after the procedure itself had already been performed, the medical director denied "preauthorization" for the

procedure. *Compare* Dragu Dec., Exh. 2 *with* Exh. 3 at 994 *with* Exh. 4 at 532.  Ms. Dragu subsequently sought preauthorization for the abutments and crowns through Dr. Parvispour (Exh. 5 at 527) and the administrator simply never responded to the request.

Procedural irregularities are matters courts must weigh "in deciding whether an administrator's decision was an abuse of discretion." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 972 (9th Cir. 2006). Here, the procedural violations in handling Ms. Dragu's claim are serious violations of the statute and the underlying regulations: ERISA requires very quick responses to pre-service claims because they are claims that concern a patient's ongoing need for health care.

But the responses to Ms. Dragu's claims did not simply violate the deadlines imposed by section 503 and the regulations, the notices also failed to contain legally required information about Ms. Dragu's rights. Any time a plan administrator renders an "adverse benefit determination" it is required to provide notice to the plan participant of her right to obtain a full and fair review, to include a description of the time limits applicable to the plan's review procedures, to inform the participant of her right to obtain documents relied on or generated during the course of the adverse benefit determination, and to include a statement of the participant's right to bring a civil action. 29 C.F.R. § 2560.503-1(g). The November 12, 2013 adverse determination did none of these things—it was not even addressed to Ms. Dragu. Exh. 4 at 532.

### 3.  The Medical Director Did Not Utilize a Reasonable Review Process

The initial review of Ms. Dragu's claims, and the communications directed to her and her physician about those claims, were overseen by the Plan's "medical director," C.H. Armstrong, III, M.D. Dr. Armstrong's approach to the claim reviews was misleading and misguided.

For example, in response to Ms. Dragu's January 6, 2013 request for preauthorization for removal of her fractured teeth, Dr. Armstrong did nothing for twenty-seven days and then asked one of his staff to send the matter to an external physician consultant, Alan Felsenfeld, D.D.S. Exh. 3 at 942. Dr. Armstrong sent along a handwritten note asking "Is the proposed surgery medical or dental?" *Id.* The terms "medical" and "dental" are nowhere defined in the Plan and do not provide a relevant or useful heuristic to divide covered services from excluded services.  The SPDs do not use such terms to distinguish one type of surgery from another, and Plan undoubtedly covers numerous medical

treatments involving the mouth. Nor are the terms "medical" and "dental" mutually exclusive in ordinary parlance. Can a dental procedure be a medical intervention? Yes. Is dentistry a field of medical practice? Yes.

Ms. Dragu's appeal was also referred to Dr. Felsenfeld for consultation. He responded more formally this time, in a letter dated February 18, 2014, in which he acknowledged that Ms. Dragu's treatment plan was reasonable and necessary. Exh. 12 at 471. But, curiously, Dr. Felsenfeld also opined on whether abutments and crowns fell within the medical benefit portion of the Plan's coverages, or the dental benefit portion: "However, the placement of abutments and crowns by the dentist are not within the parameters of the medical plan and should be considered in the dental benefit plan or paid by the patient." *Id.* Dr. Felsenfeld's conclusion in this regard was then relayed as the basis on which the claim should be denied in a memo from Dr. Armstrong to the Appeals Committee. Exh. 8 at 461.

How did Dr. Felsenfeld reach the conclusion that a particular service was "not within the parameters" of the Motion Picture Industries Health Plan for Active Participants? We don't know, because he offers no analysis. What expertise does Dr. Felsenfeld, a Professor of Clinical Dentistry at UCLA, have in interpreting the various contracts, SPDs, and trust agreements that comprise the governing terms of the Plan? There is no evidence that he has any such expertise, nor is contract interpretation a field of inquiry typically pursued by dentists in their professional capacities. Dr. Felsenfeld does not even base his coverage conclusions on any particular SPD language; in fact, there is no evidence that he even had a copy of the SPD, which is plainly a prerequisite to any determination of the scope of  the Plan's benefit programs.

Clearly it was not appropriate to seek Dr. Felsenfeld's expertise on the question of what Ms. Dragu's benefit plan covered. His expertise lies in whether the procedure was medically necessary, and he concluded that it was. Nonetheless, his conclusions about the contractual issues formed the basis of the Plan's denial of Ms. Dragu's claim, and were passed along to the Appeals Committee as the final authority and sole evidence on the contractual interpretation question.  This is not a reasonable review procedure, and the failure to use a reasonable review procedure undermines any claim to deferential review advanced by the Plan.

### 4. The Plan's Initial Denial Blatantly Misrepresents the Plan Terms

The Plan's initial denial – which was based on the assertion that the Plan covered no dental benefits whatsoever – is further evidence of its abuse of discretion. There was no plausible basis for Dr. Armstrong to conclude that the Plan simply does not cover "dental services" because the SPDs flatly contradict that statement. A denial of this sort is not the product of a good faith and principled reasoning process: it is a knee-jerk reaction based on a facile understanding of the Plan.

Dr. Armstrong's blatant misrepresentation of the Plan terms is even worse when combined with his parallel failure to notify Ms. Dragu of her rights to obtain documents and a full and fair review of the claim denial. Taken together, these actions either intentionally or unintentionally have the effect of discouraging the claimant from pursuing the matter further.

### 5. The SPD Language Changed Midway Through Ms. Dragu's Treatment

It is remarkable that in between the time that Dr. Shuken requested preapproval to install the fixtures and the time that the administrator finally got around to deciding her request for pre-service authorization of that same procedure, a new SPD was issued with a new treatment exclusion that the Appeals Committee then applied to Ms. Dragu's next treatment step. Perhaps this timing was a coincidence. Or perhaps Dr. Armstrong knew the SPD was changing in a relevant way and intentionally delayed his response until after the effective date of the new language. We cannot really know, as the administrative record does not disclose his motivations but, taken together with the other procedural irregularities, the change in the SPD does suggest that the Plan's conflict of interest was influencing its handling of Ms. Dragu's claims.

Much like the misfortune suffered by Ms. Booton in the *Lockheed* case, the plan administrator in Ms. Dragu's case did not make a reasonable effort to understand the facts of Ms. Dragu's claim or to apply all the Plan's terms to those facts. Instead, the record shows that the Plan's personnel zeroed in on an irrelevant inquiry – whether the procedures were "medical" or "dental" – while ignoring completely the Plan's clear provision of coverage for prosthetic devices. Thus, the denial of coverage was an abuse of discretion and should be overturned.

**V.    CONCLUSION**

The resolution of Ms. Dragu's claim should have been simple: the Plan covered medically necessary prosthetic devices, Ms. Dragu needed prosthetic teeth, nothing in the Plan excludes such services, so the services should have been covered.  Defendant's position to the contrary is based on an unsustainable interpretation of exclusionary language in an SPD that does not apply. Even if that SPD did apply, it also covers all medically necessary prosthetic devices and does not contain any exclusions for the initial installation of prosthetic teeth.  Accordingly, the claim denial should be overturned

Respectfully submitted,

Dated:  October 1, 2015

BOLT KEENLEY KIM LLP

By: /s/
James P. Keenley
Attorneys for Plaintiff