UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELISE DRAGU,<br><br>          Plaintiff,<br><br>     v.<br><br>MOTION PICTURE INDUSTRY HEALTH PLAN FOR ACTIVE PARTICIPANTS,<br><br>          Defendant. | Case No. 14-cv-04268-RS<br><br>**ORDER GRANTING PLAINTIFF'S AND DENYING DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT** |

## I.     INTRODUCTION

Plaintiff Elise Dragu mangled her jaw, mouth, teeth, and gums when she tumbled down a rocky creek while hiking in Northern California. She sought medical treatment for her various injuries from oral surgeon, Dr. Robert A. Shuken, D.D.S., who recommended extracting the damaged teeth, inserting bone grafts where possible, implanting fixtures for implantation of abutments and crowns, and—lastly—installing abutments and crowns as replacements for the missing teeth. Dragu requested coverage for the medical procedures from her medical benefit plan, Defendant Motion Picture Industry Health Plan for Active Participants ("the Plan"), which is subject to the requirements of the Employee Retirement Income and Security Act ("ERISA"), 29 U.S.C.§ 1001 *et seq.*

The Plan initially denied coverage for dental implants, including the implantation of fixtures and placement of abutments and crowns, on the basis that "Dental services are not covered

under the Plan." Keenley Decl. Ex. 4 at 532.[1] Dragu appealed the adverse determination to the Plan's Benefits/Appeals Committee. After reviewing the appeal, the Benefits/Appeals Committee paid Dr. Shuken for the installation of fixtures at a reimbursement rate of 50%, which was the rate available to out-of-network providers under the terms of the 2013 plan. With respect to Dragu's request for medical coverage for the placement of crowns and abutments, the Plan offered a different reason to deny the claim: "Dental implants may be covered in cases of trauma, ablative surgery or congenital anomalies. Prosthetic rehabilitation of dental implants including abutments and crowns are not covered under the medical benefit." Keenley Decl. Ex. 7 at 460. In her motion for summary judgment, Dragu contends that the Plan wrongfully denied coverage for the crowns and abutments and reimbursed Dr. Shuken at a lower rate than was required by the applicable plan. The Plan argues that its interpretation of the medical coverage agreement was proper and that it is entitled to attorney fees.

The Plan misinterpreted the plain language of the medical benefit plan when it denied Dragu coverage for the initial placement of abutments and crowns and reimbursed Dr. Shuken at the lower rate as required by the plain language of the medical benefit agreement. That interpretation of the terms of the plan was an abuse of discretion. Accordingly, Dragu's motion for summary judgment is granted; the Plan's is denied as is the Plan's request for attorney's fees.

## II.     FACTS AND PROCEDURAL HISTORY

While hiking in forests of the north coast of California, Dragu suffered terrible injuries to her wrists, body, face, and mouth after falling into a steep river embankment. As a result of the fall, Dragu's jaw and teeth were fractured, and some of her teeth were torn from the roots or pushed out of position. After undergoing jaw surgery, Dragu sought treatment for her mouth and teeth from Dr. Shuken, who recommended that she undergo multiple surgeries, including the implantation of fixtures, and affixation of prosthetic teeth—abutments and crowns. To cover the

---

[1] All citations to page numbers refer to the pages in the administrative record that begin "D000. . ." Throughout this opinion, the letter "D" and extraneous zeroes have been omitted.

expenses of the extensive mouth and jaw procedures, Dragu submitted claims for benefits to the Plan of which she is a beneficiary. The Plan is a self-funded group health plan which exists for the purpose of providing health and welfare benefits to eligible participants and their spouses and dependents.

### A. Dragu's Treatment with Dr. Shuken: Teeth Removal and Installation of Fixures

In December 2012, after Dragu had been able to heal and recover, Dr. Shuken determined that six of her teeth needed to be removed. Before proceeding with the surgery, Dr. Shuken submitted a pre-approval authorization request, seeking authorization for approval to remove Dragu's unsalvageable teeth surgically, insert bone grafts, and administer anesthesia. Included with the pre-authorization documents was the long-term treatment plan, which envisioned work with a prosthodontist to insert implants to replace the teeth. On February1, 2013, before the Plan responded to the pre-authorization request, Dragu underwent the tooth extraction surgery; Dr. Shuken placed bone grafts into her jaw where needed. Soon thereafter, the Plan approved Dr. Shuken's pre-approval request for surgical removal of teeth, bone replacement grafts, and anesthesia.

Happily, Dragu healed and went forward with the next phase of her treatment plan: the installation of fixtures. Again, on August 29, 2013, Dr. Shuken submitted a pre-approval authorization request for endosteal surgical implants—insertion of posts to anchor the crowns and abutments. Two weeks later, Dr. Shuken installed three fixtures successfully. On September 16, 2013, he submitted a claim for payment for the successful procedure.

### B. The Plan Changes the Terms of the Summary Plan Descriptions ("SPDs")

In the meantime, the Plan adopted and implemented a new SPD to go into effect on October 1, 2013, which superseded the 2007 SPD. The 2013 SPD became "effective for expenses incurred on or after October 1, 2013 . . . ." Keenley Decl. Ex. 10 at 157. Of particular importance was the change in coverage for "dental implants." Both the 2007 and 2013 SPDs did not provide coverage for "dental treatments" as a medical benefit with the exception of certain dental treatments for the following medical diagnoses: "myalgia, myositis, migraine, trigeminal

neuralgia, sleep apnea, and temporomandibular joint disorder." *Compare* Keenley Decl. Ex. 11 at 372 (2007 SPD), *with id.* Ex. 10 at 216 (2013 SPD). The 2007 SPD excluded dental implants from the services covered under the medical plan "except where there is no other dental alternative." Keenley Decl. Ex. 11 at 380. In contrast, the 2013 SPD provided coverage for dental implants "in cases of trauma, ablative surgery or congenital anomalies. Prosthetic rehabilitation of dental implants including abutments and crowns are not covered under the medical benefit." *Id.* Ex. 10 at 217.

### C. Dragu's Treatment with Dr. Parvizpour: Placement of Abutments and Crowns

In fall 2013, following the successful fixture implantation, Dragu began her treatment with the prosthodontist, Dr. Shahariar Parvizpour, who submitted a pre-authorization request on October 31, 2013, for the placement of abutments and crowns into the fixtures. Dragu wanted to begin that procedure in November 2013, but she delayed the procedure to await the Plan's response to Dr. Parvizpour's pre-authorization request. Eventually, Dragu decided to pay for the procedure out of pocket and seek reimbursement. She underwent several procedures to install abutments and crowns in March, April, and June 2014.

### D. Dragu's Administrative Appeal of the Adverse Benefits Determinations

On November 12, 2013, the Plan denied Dr. Shuken's pre-authorization request for the fixture implantation because "[d]ental services are not covered under the Plan." Keenley Decl. Ex. 4. Dissatisfied with this response, on January 17, 2014, Dragu filed an appeal with the Benefits/Appeals Committee of the denial for fixture implantation seeking coverage for "all medically necessary procedures" for reconstruction of her mouth. She specifically referenced the 2013 SPD's coverage of dental implants in cases of trauma and reconstructive surgery. *Compare* Keenley Decl. Ex. 6 at 472, *with id.* Ex. 10 at 217. C.H. Armstrong, the medical director of the plan, reviewed Dragu's appeal and concluded that the Plan should cover the implantation of the fixtures, but not the placement of abutments and crowns. Mason Decl. Ex. D-1 at 478, 493.[2] In

---

[2] Dragu challenges the admissibility of the substance of Mason's Declaration because the statements contained therein are not part of the administrative record, and apparently moves to

1  February 2014, the Plan paid Dr. Shuken for the implants at a rate of 50% of the amount charged
2  because he is an out-of-network provider. The Plan issued Dragu an explanation of benefits,
3  which listed the payments for the installation of the fixtures, but did not reference the appeal.

4  Soon thereafter, Dr. Armstrong turned to review Dragu's appeal again. He prepared a
5  memorandum for the Benefits/Appeals Committee, summarizing the appeal in which he again
6  referenced the 2013 SPD's exclusion of "prosthetic rehabilitation of dental implants" and noted
7  that the Plan's "maxillofacial and oral surgeon consultant" reviewed the file and agreed that the
8  placement of crowns and abutments did not qualify as a "medical benefit," and is subject to the
9  terms of the dental benefit plan. Keenley Decl. Ex. 8 at 461. On March 25, 2014, the Plan issued
10  the following final decision regarding Dragu's "[r]equest for benefits for dental services—crowns
11  and abutments": "Your appeal was denied. The determination of the Committee was that per the
12  Active MPI Health Plan Summary Plan Description, October 2013—page 57, 'Prosthetic
13  rehabilitation of dental implants including abutments and crowns are not covered under the
14  medical benefit.'" Keenley Decl. Ex. 7 at 460.

15  Once again discouraged by the outcome of the administrative appeal, Dragu filed this
16  claim for benefits pursuant to ERISA § 502(a)(1)(B). After exchanging discovery, Dragu and the
17  Plan filed dueling motions for summary judgment. Dragu insists that the Plan made two
18  erroneous determinations about her entitlement to benefits. First, she maintains that the Plan
19  should have paid for the placement of crowns and abutments. Second, she contests the rate at
20  which the Plan paid Dr. Shuken for the installation of fixtures into her mouth. The Plan paid Dr.
21  Shuken at a rate of 50% of the allowable charge under the 2013 SPDs; Dragu claims that the Plan
22  should have paid for the installation at a rate of 70% for out-of-network providers or 90% for Blue
23  Shield Preferred Providers under the 2007 SPDs.

---

strike the inadmissible portions of the declaration. New evidence not before the claims administrator may be admitted "under carefully circumscribed conditions." *Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan*, 46 F.3d 938, 943 (9th Cir. 1995). Nothing in the Mason declaration affected the outcome of these motions for summary judgment, however, so Dragu's motion is denied as moot.

### III. LEGAL STANDARD

A party is entitled to summary judgment when "there is no genuine dispute as to any material fact and the movement is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party who seeks summary judgment bears the initial responsibility of identifying an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies this initial burden, the non-moving party must present specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324. "Only disputes over facts that might affect the outcome of the suit under governing law" are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue exists if the non-moving party presents evidence from which a reasonable fact-finder, viewing the evidence in the light most favorable to that party, could resolve the material issue in his or her favor. *Id.* at 248-49.

### IV. DISCUSSION

#### A. Standard of Review

Dragu and the Plan disagree about the proper standard of review to apply—de novo or abuse of discretion. "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). "[I]f the plan *does* confer discretionary authority as a matter of contractual agreement, then the standard of review shifts to abuse of discretion." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (emphasis in original). Under this deferential standard of review, "the plan administrator's interpretation of the plan 'will not be disturbed if reasonable.'" *Conkright v. Frommert*, 559 U.S. 506, 521 (2010) (quoting *Firestone*, 489 U.S. at 111).

The parties agree that the terms of the plan give discretion to the plan administrators. Indeed, the terms quite clearly grant the Directors of the Plan "full discretion and authority to interpret the Plan and to decide any factual questions related to eligibility for and the extent of

benefits provided by the Plan." Keenley Decl. Ex. 10 at 157 (2013 SPD); Ex. 11 at 317 (2007 SPD). Although Dragu agrees that the Plan has discretion to interpret the Plan, she disputes whether the Directors actually exercised their discretion. To be entitled to review under the deferential abuse-of-discretion standard of review the administrator must actually exercise "discretion that the plan grants as a matter of contract." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 971-72 (9th Cir. 2006). Dragu argues that the Benefits/Appeals Committee did not actually exercise the discretion under the Plan because the Committee did not provide analysis in the letter denying the appeal and merely recites the language from the 2013 SPD.

An administrator does not exercise discretion when a claim is deemed denied because of "the mechanical result of a time expiration," or exercises discretion not granted by the terms of the contract. *Jebian v. Hewlett-Packard Co. Emp. Benefits Org. Income Prot. Plan*, 349 F.3d 1098, 1105 (9th Cir. 2003). In all other circumstances where "an administrator engaged in a genuine, productive, ongoing dialogue that substantially complies with a plan's and the regulations' timelines," de novo review is inapplicable. *Id.* at 1108. Dragu does not claim that the Plan exceeded the limits of its authority to exercise discretion. Nor does she contend that the Plan denied her claim because of a missed deadline. As such, she cannot demonstrate that the Plan did not exercise its discretion. Although the denial letter is, indeed, devoid of analysis, the Committee exercised its discretion to determine which version of the SPD to apply and which provision of the SPD governed Dragu's claim for benefits. This exercise of discretion is therefore reviewable for only an abuse of discretion.

"What deference means is that the plan administrator's interpretation of the plan will not be disturbed if reasonable." *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 675 (9th Cir. 2011) (internal quotation marks omitted). "ERISA plan administrators abuse their discretion if they render decisions without any explanation, construe provisions of the plan in a way that conflicts with the plain language of the plan or rely on clearly erroneous findings of fact." *Day v. AT & T Disability Income Plan*, 698 F.3d 1091, 1096 (9th Cir. 2012) (internal quotation marks and alterations omitted). Moreover, a plan administrator abuses its discretion if its application of

the terms of the plan is "'(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record.'" *Id.* at 676 (quoting *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009)). "If any of these three apply, only then are we able to have a definite and firm conviction that the district court reached a conclusion that was a mistake or was not among its 'permissible' options, and thus that it abused its discretion by making a clearly erroneous finding of fact." *Hinkson*, 585 F.3d at 1262 (internal quotation marks omitted).

### B. The Placement of Abutments and Crowns

Dragu's claim rises and falls on whether the Plan abused its discretion. She offers numerous reasons to conclude that the Plan did so: conflict of interest, non-compliance with the deadlines to respond to claims for benefits, an unreasonable review process, the change in the terms of the plan midway through the treatment procedures, and the plain language of the plans. Only the last argument is persuasive.

1. Conflict of Interest

First, Dragu argues that the Benefits/Appeals Committee was conflicted when it reviewed her claims for medical benefits. A conflict of interest does not alter the standard of review, but it does "adjust the level of skepticism" a court applies to determine whether an administrator abused its discretion. *Montour v. Hartford Life & Accident Ins. Co.*, 588 F.3d 623, 631 (9th Cir. 2009). When "facts and circumstances indicate the conflict may have tainted the entire administrative decisionmaking process, the court should review the administrator's stated bases for its decision with enhanced skepticism." *Id.* The only conflict Dragu identifies is that some of the Committee members are people appointed by the plan sponsors who are ultimately responsible for paying benefits. This fact alone is not enough to infer a structural conflict of interest.

The Plan is governed by a joint-trusteed labor management trust, commonly known as a Taft-Hartley multiemployer health and welfare plan governed by Section 302(c)(5) of the Taft-Hartley Act. The Board of Directors consists of thirty-two trustees and eight officers. Because the Taft-Hartley Act governs the administration of the plan, the Board consists of equal numbers of employer-appointed trustees and employee-appointed trustees, *see* 29 U.S.C. § 186(c)(5)(B), thus

"alleviating the bias found where a single employer administers its self-funded plan." *Muse v. Cent. States, Se. & Sw. Areas Health & Welfare & Pension Funds*, 227 F. Supp. 2d 873, 877 (S.D. Ohio 2002). As such, Dragu has not provided sufficient evidence to conclude that the administrator is inherently conflicted.

2. Procedural Irregularities

Second, Dragu contends that the Plan's determination of benefits is suspect because it did not comply with the deadlines for responding to claims for pre-authorization of benefits and post-service payment. 29 U.S.C. § 1133 requires ERISA plan administrators to "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant" and "afford a reasonable opportunity . . . for a full and fair review by the appropriate named fiduciary of the decision denying the claim." The Secretary of Labor has promulgated regulations to address how quickly a fiduciary or administrator must respond to a pre-authorization request or post-service claim for payment. "In the case of a pre-service claim," the regulations require the plan administrator to "notify the claimant of the benefit determination (whether adverse or not) within a reasonable period of time appropriate to the medical circumstances, but not later than 15 days after receipt of the claim by the plan." 29 C.F.R. § 2560.503-1(f)(A). If the administrator needs additional time to respond to the claimant, it may extend the deadline "for up to 15 days, provided that the plan administrator both determines that such an extension is necessary due to matters beyond the control of the plan and notifies the claimant, prior to the expiration of the initial 15–day period, of the circumstances requiring the extension of time and the date by which the plan expects to render a decision."

"[A]n administrator's failure to comply with [ERISA's] procedural requirements ordinarily does not alter the standard of review." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 971 (9th Cir. 2006). "That generalization does not mean, however, that procedural irregularities are irrelevant"; procedural regularities are factors to weigh "in deciding whether an administrator's decision was an abuse of discretion." *Id.* at 972. Serious procedural irregularities weigh more

heavily in favor of finding that the administrator abused its discretion. *Id.* Smaller procedural irregularities may also constitute evidence of an abuse of discretion "when the irregularities have prevented full development of the administrative record." *Id.* at 973. The key question to answer is whether the administrator "engaged in an ongoing, good faith exchange of information" with the claimant. *Id.* at 972 (internal quotation marks omitted).

Here, Dragu highlights three instances where the Plan did not comply with the timelines prescribed by 29 C.F.R. § 2560.503-1(f)(A). The Plan approved Dr. Shuken's pre-service authorization request for the surgical removal of damaged teeth and insertion of bone grafts after twenty-seven days. When Dr. Shuken submitted a pre-service authorization request for installation of fixtures, the Plan took seventy-five days to deny the request. Finally, Dr. Parvispour submitted a pre-authorization request for the placement of crowns and abutments to which the Plan's only response came in the context of Dragu's appeal of the denial of the pre-authorization request for installation of fixtures. Dragu asserts that these delays should be considered a significant factor when weighing whether the Plan abused its discretion. While the uncertainty about whether she would receive coverage for extensive, expensive surgeries was surely distressing, Dragu must be able to identify how the delays interfered with her ability to press her appeal. Ultimately, the dispute between Dragu and the Plan comes down to the interpretation of the terms of the SPDs, which does not rely on differing views of the facts. Indeed, at all times, the Plan and Dragu agreed about the factual basis for her claim. The delays did not affect the terms of those agreements, and so any procedural irregularities do not weigh in favor of finding that the Plan abused its discretion.

3. <u>Review Procedure</u>

Third, Dragu insists that one factor to consider when deciding whether the Plan abused its discretion is that Dr. Armstrong, the Plan's administrator, used a "misleading and misguided" review process. Plf.'s Mot. for Summ. J. at 17. Specifically, Dragu objects to Dr. Armstrong's decision to refer the appeal to an outside consultant, Alan Felsenfeld, D.D.S. with the following question: "Is the proposed surgery medical or dental?" Keenley Decl. Ex. 3 at 942. The primary

reason Dr. Armstrong referred Dragu's case to Dr. Felsenfeld was "to determine if the services provided are reasonable and necessary and supported by the documentation included." Keenley Decl. Ex. 12 at 471.  Although Dr. Felsenfeld concluded that the procedures were all reasonable, necessary, and supported by documentation, he also offered his opinion as to whether the Plan covered those procedures.  Of critical importance was Dr. Felsenfeld's conclusion that "the placement of abutments and crowns by the dentist are not within the parameters of the medical plan and should be considered in the dental benefit plan or paid by the patient." *Id.*  According to Dragu, the referral to Dr. Felsenfeld and apparent reliance on his conclusions was unreasonable because he specializes in dentistry, not contract interpretation.  In addition, she notes that the Plan does not define "dental" or "medical," and therefore she could not meaningfully challenge Dr. Felsenfeld's conclusion.

To ensure that plan administrators review claims for benefits fairly and reasonably, the regulations require that plan administrators,

> provide to every claimant who is denied a claim for benefits written notice setting forth in a manner calculated to be understood by the claimant:  (1) The specific reason or reasons for the denial; (2) Specific reference to pertinent plan provisions on which the denial is based; (3) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and (4) Appropriate information as to the steps to be taken if the participant or beneficiary wishes to submit his or her claim for review.

29 C.F.R. § 2560.503-1(f).  "In simple English, what this regulation calls for is a meaningful dialogue between ERISA plan administrators and their beneficiaries.  If benefits are denied in whole or in part, the reason for the denial must be stated in clear language, with specific reference to the plan provisions that form the basis for the denial." *Booton v. Lockheed Med. Ben. Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997).

Dragu has not identified how the Plan failed to engage her in a meaningful dialogue.  The Plan's decision to consult with Dr. Fesenfeld was not illogical, although it may appear to be unnecessary.  When a beneficiary appeals an adverse benefit determination "based on medical

necessity, experimental treatment, or similar Exclusion or limit," the Plan must refer the case to "a health care professional who has appropriate training and experience in the field of medicine, and who: 1) was not consulted in connection with the initial" determination, and "2) was not the subordinate of the decision maker in the initial determination."  Keenley Decl. Ex. 10 at 228. Although the Plan did not deny Dragu's claim for benefits "based on medical necessity, experimental treatment, or similar Exclusion or limit," the decision to refer her appeal to an independent doctor to review the medical necessity of the procedure was not out of line.  Although Dr. Fesenfeld possesses no special talent in the area of contract interpretation, the decision to seek his counsel about the medical necessity of the procedure was not out of line.

### 4. Change in Plan Terms

Fourth, Dragu implies that the Plan delayed consideration of her appeal so that the less-generous 2013 SPD would go into effect, and therefore the Plan abused its discretion.  All she offers, however, is speculation without providing an evidence-based link.  As such, that the terms of the plan changed while Dragu was pursuing her appeal is not sufficient to conclude that the Plan abused its discretion.

### 5. The Plain Language of the Plan

Fifth, Dragu offers two arguments for why the plain language of the plan covers the installation of abutments and crowns.  First, she contends that the 2007 SPDs—as opposed to the 2013 SPDs—apply to her claim for benefits, and the 2007 SPDs plainly cover all of her rehabilitative treatment.  Second, Dragu argues that the plain terms of the 2013 SPDs do not exclude the *installation* of crowns and abutments; they exclude the *rehabilitation* of existing prosthetic teeth.  Only the second of these arguments is persuasive.

#### a. Whether the 2007 or 2013 SPDs Apply to the Placement of Abutments and Crowns

Both the 2007 and 2013 SPDs provide coverage for "medically necessary and reasonable" services.  Keenley Decl. Ex. 10 at 202 (2013 SPD); Ex. 11 at 358 (2007 SPD).  Both plans also cover prostheses and braces "under Durable Medical Equipment."  *Id.* Ex. 10 at 378 (2007 SPD);

Ex. 11 at 221 (2013 SPD).  Under both versions of the Plan, replacement of prostheses is covered "only for medical necessity."  *Id.* Ex. 10 at 217 (2013 SPD); Ex. 11 at 374 (2007 SPD).  Dragu contends that both plans unambiguously cover abutments and crowns as a medical benefit because abutments and crowns are a subclass of prostheses.[3]

The key difference between the two SPDs is coverage for "dental treatment" and medical services provided by dentists.  The 2007 SPDs explicitly exclude from coverage "dental implants (except where there is no other dental alternative)."  Keenley Decl. Ex. 10 at 380.  However, the 2007 version of the medical benefit included "medical services provided by dentists" for the following diagnoses to the head and mouth:  "myalgia, myositis, migraine, trigeminal neuralgia, sleep apnea, temporomandibular joint disorder."  *Id.* Ex. 11 at 373.  There was also "a limited benefit of $2,500 every two (2) years for the development and production of any required oral appliance under the direct of the dentist."  *Id.*  In contrast, the 2013 SPDs were amended to provide coverage for "dental implants" among the covered "medical services provided by dentists" "in cases of trauma, ablative surgery or congenital anomalies."  Keenley Decl. Ex. 10 at 217. Coverage of dental implants is limited as follows:  "Prosthetic rehabilitation of dental implants including abutments and crowns are not covered under the medical benefit."  *Id.*

Dragu would prefer that the 2007 SPDs govern the coverage of her treatment because that version of the medical benefit does not mention any exclusion for abutments and crowns.  She contends that the 2007 SPDs apply because the placement of abutments and crowns was part of her treatment plan, which was set in motion before October 1, 2013.  She argues that she "incurred" all expenses related to the treatment plan as soon as she began following the treatment plan.  On the other hand, the Plan maintains the rather curious position that Dragu did not "incur"

---

[3] Neither SPD provides a restricted list of the types of prostheses covered as durable medical equipment.  The 2007 SPDs, however, include four requirements and limitations to the durable-medical-equipment benefit:  (1) a doctor prescription for the equipment; (2) the equipment is medically necessary; (3) an opportunity for the Medical Review Department to review the medical necessity of the equipment; and (4) recommended preauthorization.  Keenley Decl. Ex. 11 at 373. Among the types of durable mouth devices for which the 2007 SPDs "strongly recommend[]" pre-authorization are mouth/teeth guards.  *Id.*

the expense of the procedure until it denied her coverage. To support its contention, the Plan relies on *Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1160-61 (9th Cir. 2001), where the Ninth Circuit held that the level of discretion given to the plan administrator's decision to deny a claim for life insurance is determined by the terms of the plan at the time the ERISA claim accrued, i.e., the time of denial. *Groz-Salomon* is simply not applicable to this case. Whether the 2007 or 2013 SPDs apply to Dragu's treatments is a matter of contract interpretation, not interpretation of the ERISA statute. As such, the task is to determine when Dragu "incurred" the expense of her treatment and apply the appropriate version of the medical benefit.

That task is not as difficult as the parties contend. The plain meaning of "incur" is "[t]o suffer or bring on oneself (a liability or expense)." *Incur*, Black's Law Dictionary (10th ed. 2014). That point in time is the date the doctor performed the medical service. Had the Plan changed the terms of the medical coverage the day before the scheduled procedure, Dragu could have avoided the pain and expense of the procedure. Once Dr. Parvisopour placed the abutments and crowns into Dragu's mouth, however, he was entitled to payment for his work under the terms of the medical benefit in effect on the date of service. As such, the 2013 SPDs apply to the services Dr. Parvisopour performed: the initial placement of abutments and crowns.

### b. Whether the Terms of the 2013 SPDs Exclude the Placement of Abutments and Crowns

Dragu's sole persuasive argument is that the 2013 SPDs do not, in fact, exclude from the medical benefit the initial placement of abutments and crowns. The plain language of the policy demonstrates that she is correct. The 2013 SPDs exclude "[p]rosthetic rehabilitation of dental implants including abutments and crowns," but are silent about the initial placement of abutments and crowns. Commonly understood, "rehabilitation" is "[t]he restoration of a thing to a previous condition or status." *Rehabilitation*, Oxford English Dictionary, http://www.oed.com/view/Entry/161448?redirectedFrom=rehabilitation#eid (last visited Oct. 29, 2015). In this case, the "thing" to be restored is the prosthesis, i.e. the crowns and abutments. The language of the plan therefore plainly excludes coverage for restorative work to existing crowns

and abutments, as is the case for all other durable medical equipment. Thus, the Plan's reliance on the exclusion of prosthetic rehabilitation of dental implants was illogical and denial of coverage was an abuse of discretion. Accordingly, Dragu's motion for summary judgment is granted with respect to the denial of coverage for placement of abutments and crowns, and the Plan's motion for summary judgment is denied.

### C. The Installation of Fixtures

Dragu contends that the Plan abused its discretion by paying Dr. Shuken at a 50% reimbursement rate for out-of-network providers pursuant to the 2013 SPDs rather than the 70% rate for out-of-network providers or 90% reimbursement rate for Blue Shild Preferred Providers allowed under the 2007 SPDs. The Plan offers three ripostes. First, the Plan argues that Dragu did not exhaust her administrative remedies to appeal the 50% reimbursement rate. Second, the Plan contends that the 2013 SPDs apply to Dr. Shuken's post-service payment request because the Plan denied his request after the 2013 SPDs went into effect even though he performed the service before the change in reimbursement rate went into effect. Finally, in its reply brief, the Plan insists that the lower reimbursement rate went into effect on August 1, 2009—long before Dragu suffered injury to her mouth.

#### 1. Administrative Exhaustion

Although ERISA does not explicitly require that a plan participant or beneficiary exhaust administrative remedies before filing a claim under § 502 of ERISA, 29 U.S.C. § 1132, the Ninth Circuit long ago concluded that "federal courts have the authority to enforce the exhaustion requirements in suits under ERISA." *Amato v. Bernard*, 618 F.3d 559, 568 (9th Cir. 1980). Accordingly, before an ERISA plaintiff may file a claim for damages, she must first "avail . . . herself of a plan's own internal review procedures." *Diaz v. United Agric. Emp. Welfare Benefit Plan & Trust*, 50 F.3d 1478, 1483 (9th Cir. 1995). ERISA requires inclusion of the plan's internal review procedures with the plan instrument and SPDs. *Vaught v. Scottsdale Healthcare Corp. Health Plan*, 546 F.3d 620, 627 (9th Cir. 2008) (citing 29 U.S.C. §§ 1102(a)(1), 1022). The internal review procedures are part of the contract between the plan and the plan participants, and

so the terms of that contract dictate how a claimant must pursue her claim before filing suit.  *See id.* at 627.

The Plan argues that its terms require participants and beneficiaries to exhaust all *issues* related to the denial of the claim—as opposed to *claims*—before filing a claim under ERISA.  Not so.  Issue exhaustion may be required by ERISA's statutes or regulations or the terms of the benefit plan.  *Vaught*, 546 F.3d at 630.  ERISA and its companion regulations, however, do not require issue exhaustion, and so whether a claimant must exhaust her claims depends on the terms of the operative plan.  *Id.*  Dragu's EOB requires a beneficiary appealing an adverse benefit determination to "state specifically why" she disagrees with the determination.  Mason Decl. Ex. D. at 548.  In *Vaught*, the Ninth Circuit considered whether a plan that required that appellants "'clearly explain . . . the reason why you think the Claims Administrator should reconsider your claim.'"  546 F.3d at 629 (alteration in original).  The court held that it did not contain such a requirement because the plan at issue did not "require[e] claimants to list the specific issues to be considered on appeal," but instead "limit[ed] a claimant to a single reason."  *Id.* (internal quotation marks omitted).  As in *Vaught*, here, the Plan does not explicitly require a claimant to list each issue; the claimant need only provide a basis for the appeal.  Thus, the plan's appeals procedure did not explicitly demand issue exhaustion.

Moreover, Dragu, in fact, availed herself of all administrative proceedings available to her under the terms of the plan.  The Plan initially denied Dr. Shuken's claim for payment entirely.  In January 2013, Dragu appealed that denial of coverage for the placement of implants,[4] stating reasons why the denial was erroneous.  In the course of considering Dragu's appeal, the Plan reconsidered its position and paid Dr. Shuken at the 50% reimbursement rate, but also denied coverage for the placement of abutments and crowns.  Although the administrative record is confusing on this point, this final denial was the Plan's final decision as to whether the medical benefit covered the implantation of fixtures and the placement of abutments and crowns.

---

[4] The record is not clear as to whether this denial encompassed Dr. Shuken's and Dr. Parvisopour's claims for payment.

Neither ERISA nor the terms of the Plan necessitate those claimants who are dissatisfied with the result of the appeal to challenge the final decision of the Benefits/Appeals Committee again. Indeed, the final decision letter informed Dragu that "the decision of the Benefits/Appeals Committee is final and binding upon all parties," and if Dragu chose to "contest the appeal determination, [she had] the right to bring a court action in accordance with Section 502(a) of ERISA." Keenley Decl. Ex. 7. Thus, by the plain terms of the plan, Dragu had run out of administrative remedies and her only option was to file a claim pursuant to ERISA. She exhausted all available administrative remedies.

### 2. Whether the 2007 or 2013 SPDs Apply

The Plan renews its contention that the 2013 SPDs apply to any pre- or post-service claims for payment denied or adjudicated after October 1, 2013, rather than the date of service. The plain language of the SPDs contradicts this notion. The 2013 SPDs apply to "expenses incurred on or after October 1, 2013." Keenley Decl. Ex. 10 at 157. As discussed above, Dragu incurred the expense of a service when it was performed, and the Plan must pay the designated rate that was applicable on the date of the service. Any other result is illogical and grossly unfair. Plan beneficiaries, like Dragu, make decisions about their health care providers by considering the terms of their medical benefit plans. The Plan cannot unilaterally change the terms of the agreement after the beneficiary or participant can no longer change course. The plain terms of the 2007 and 2013 SPDs make one thing clear: the 2007 SPD governed the rate of reimbursement for the installation of dental fixtures. Accordingly, the Plan abused its discretion when it compensated Dr. Shuken at the 50% out-of-network rate, rather than the 70% or 90% rate.

### 3. The Impact of the Summer 2009 Amendment

As its final act in this litigation, the Plan submitted a supplemental declaration and exhibit, which, it says, settles the question whether the Plan should have paid Dr. Shuken for the installation of fixtures at the 50% reimbursement rate. Apparently, in summer 2009, the Plan adopted an amendment to the 2007 SPDs, which increased participants' out-of-pocket costs for non-MPTF or Blue Shield-contracted providers. *See* Mason Suppl. Decl. Ex. A at 1802.

Because the Plan submitted this document in its reply brief, Dragu has not been able to respond to this new argument. Generally, "'[i]t is improper for a moving party to introduce new facts or different legal arguments in the reply brief than those presented in the moving papers.'" *Dytch v. Yoon*, No. C 10-02915 MEJ, 2011 WL 839421, at *3 (N.D. Cal. Mar. 7, 2011) (quoting *United States ex rel. Giles v. Sardie*, 191 F.Supp.2d 1117, 1127 (C.D.Cal.2000)) (citing *State of Nev. v. Watkins*, 914 F.2d 1545, 1560 (9th Cir.1990) ("[Parties] cannot raise a new issue for the first time in their reply briefs." (citations omitted)); *United States v. Romm*, 455 F.3d 990, 997 (9th Cir.2006) (citing *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir.1999)); *Cedano–Viera v. Ashcroft*, 324 F.3d 1062, 1066 n.5 (9th Cir.2003) ("[W]e decline to consider new issues raised for the first time in a reply brief."); *Bazuaye v. INS*, 79 F.3d 118, 120 (9th Cir.1996) ("Issues raised for the first time in the reply brief are waived."); *Ass'n of Irritated Residents v. C & R Vanderham Dairy*, 435 F.Supp.2d 1078, 1089 (E.D.Cal.2006) ("It is inappropriate to consider arguments raised for the first time in a reply brief.")). Accordingly, the Plan has forfeited the right to assert this argument to support its motion for summary judgment.

…

Dragu has demonstrated that the Plan misapplied the plain language of the medical benefit agreement when it opted to reimburse Dr. Shuken at a rate of 50%. As there is nothing in the record establishing whether Dr. Shuken is a Blue Shield Preferred Provider or an Out-of-Network provider, this issue is remanded to the insurer for additional fact development.

### D. The Plan's Claim for Attorney Fees

The Plan seeks reasonable attorney fees from Dragu on the theory that her claim is baseless. *See* 29 U.S.C. § 1132(g)(1). When considering whether to award attorney fees under ERISA the following factors are relevant:

> (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of fees; (3) whether an award of fees against the opposing parties would deter others from acting under similar circumstances; (4) whether the parties requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding

ERISA; and (5) the relative merits of the parties' positions.

*Hummell v. S. E. Rykoff & Co.*, 634 F.2d 446, 453 (9th Cir. 1980). Dragu has pressed meritorious claims, and therefore the Plan cannot show that she filed them in bad faith. Accordingly, the Plan's request for fees is denied.

## V. CONCLUSION

An ERISA plan administrator abuses its discretion when it strays from the plain terms of the plan. Here, the Plan contravened the terms of the medical benefit plan twice: first, by denying coverage for the initial placement of abutments and crowns into Dragu's mouth; and, second, by reimbursing Dr. Shuken at a rate of 50% when the plan specified that he should be paid at a rate of 70% or 90%. Accordingly, Dragu's motion for summary judgment is granted, and the Plan's motion for summary judgment is denied. Dragu's claim for benefits is remanded to the insurer to develop the factual record of Dr. Shuken's provider status.

**IT IS SO ORDERED**.

Dated: November 16, 2015

_____
RICHARD SEEBORG
United States District Judge